You feel free to begin whenever you're ready. Okay, thank you. May it please the Court, I would like to reserve five minutes of my time for rebuttal if I have 15 minutes. I'm not... You do have 15 minutes. Okay, I'd like to reserve five. I'm Lisa Rasmussen and I represent Jamal Johnson in this case. I have represented him since 2004 and I think this is the case of my career that will haunt me. Here is what happened in a nutshell. This case went to trial with literally none of the evidence that I was able to later obtain as appellate counsel and that is the evidence that formed the basis for the motion for new trial, which was denied. The evidence was extensive. It was 72,000 pages. Amongst it were a grand jury testimony from Monique Morris, one of the witnesses who testified at trial, where she detailed her life as a gangbanger. That would have been important to have and to use to cross-examine her at trial. There were FBI reports, 302s. There were witness statements. There was numerous... Can I interrupt just for a second to get something clarified at the outset? In this case, your client ultimately confessed to being at least present at the scene of the crime, right? He did. And had some involvement, he just denied being the person, I guess, who shot either of the individuals? Well, not exactly. But in his statement, he does say that he was there, but that he was not one of the people who did the shooting. Okay. So, and I know you have an attack on, I guess, the legitimacy of that confession, but if we weren't to agree with your argument on that, and so that we determine that the State courts reasonably concluded that the confession was valid and properly admitted, then I guess I'm having a hard time seeing how you have 72,000 pages of impeachment material as to these two witnesses, Parker and Morris is the other one. Correct. I have a real hard time understanding how that could possibly have made a difference when the jury heard your client basically lay out his involvement in everything that went wrong in this crime up to the actual pulling of the trigger, I guess. Well, when Brady is violated, then it's not a fair trial, and he's entitled to reversal, and he's entitled to a new trial. Well, no. That is most definitely not the standard. You've got to show there's some reasonable probability that the outcome would have been different, right? Correct. And in Nevada, the standard is even more lenient. It's a reasonable possibility once the specific requests are made. Okay. But that's what I'm saying. But that is correct. So the jury hears your client. I mean, it's a videotape confession, if I remember? It's audiotaped. Audiotaped. Okay. Yes. Anyway, but I mean, they hear him and they... And it was played to them, and he explained that he was given certain scenarios to say before the interview, which is his secret claim. But that's why I'm saying, that's why I was saying, if we don't agree with your argument as to the legitimacy of the confession, then all of that gets taken off the table, and we are presented with a record in which the jury heard your client confess, and then you say, oh, well, but we could have taken a few more shots at a couple of witnesses, one of whom, I mean, Ms. Morris, is totally collateral. Well, I don't think that it's collateral because she testifies that she's in a car with him and that he makes insinuations that he was there because she asked... But he confessed, that's right, my whole point. He confessed to being there. Yes, Judge Watson. So how could her... My name is Watford. I'm sorry. I'm sorry. How could... Just say, Your Honor, it's much easier. I'm sorry, Your Honor. How could her, even if you had 10,000 pages of impeachment material as to her, how could that possibly matter when she added a very collateral detail that your client himself confessed to? Well, first of all, if you had a trial where you only had that confession, it would be a very different dynamic, and I'm not sure that the State would have sufficient evidence, and that is all they would have had. So if you take away DeMarco Parker and you take away Monique Morris, and then you have... All you have is his alleged confession, which he says was what Detective... What the Detective Hardy told him to say. Well, both he and Detective Hardy were not very believable, but the jury had to figure out which one of them they believed, as did the State Court, and I'm not sure how we can alter the credibility determinations that were made. I don't think that you can alter the credibility determinations. I think that you've, as you've acknowledged, Detective Hardy is not very credible because at the initial time he's asked about this, he states that he spoke to her for an hour. Right, right, and then at trial he says there was no pre-interview, and the previous time frame gets shorter and shorter and shorter every time he talks about it, but he did testify under oath at trial, and whether I find him credible is irrelevant, isn't it, if the State Courts said that was a ground for not granting the Siebert-type relief? Well, one of the things that happened in this case, because I started trying to work on the motion for new trial, was initially told I had no right to do it, and then got that clarified, is that I asked the Nevada Supreme Court to allow me to do the motion for new trial before I did the appeal, but that was denied, which was fine, except that the result was I did the Siebert, Missouri claim initially on direct appeal, and they said, well, it wouldn't have mattered because there was the testimony of DeMarco Parker and Monique Morris. Well, what is it you're asking us to do in terms of relief now? I'm asking you to reverse and send it back to the district court with an instruction to grant the petition for writ of habeas corpus, and to give the State a certain time to determine whether to retry him. Well, let's be realistic. It may be an evidentiary hearing. The question is this, to me, on the Miranda issue. You get three different Miranda points. One is the Siebert point, and the Missouri v. Siebert came down after the trial, right? Correct. But it came down before the Nevada Supreme Court did what it did. The record, to me, is very ambiguous on this two-step thing that the Supreme Court condemned in Siebert. And my question is, post-Siebert, did you ever ask any court or any judge in this process to have an evidentiary hearing directly focused on the Siebert issue as opposed to the other couple of Miranda issues? I did not ask specifically for an evidentiary hearing on Siebert. I asked numerous times, as I think you see. You asked for a Brady-related one. I asked for an evidentiary hearing on habeas. And that was one of my claims. But Siebert, I mean, you've got the Miranda issue about, you know, what Hardee's credibility, and about whether or not he misled your client into saying, don't worry, we're not here to — we're going to talk about the murder, but you're not charged with that, and I'm Mirandizing you with respect to the burglary, but not the murder and all that. That's a separate issue from Siebert. Siebert is whether this two-step thing, that something happened in phase one. And I find, you know, it's a compelling argument but for the fact that there's no evidentiary record on Siebert. I understand that's in part because Siebert came down partway through this process. But unless you or your predecessor asked a judge, state or federal, can I have a hearing on Siebert to ask the relevant questions and develop this, what can we do about the Missouri claim? Well, to be clear, I have always asked for an evidentiary hearing, and I don't disagree that I did focus on the Brady issues. But in federal court, I asked plainly for an evidentiary hearing on my claims of which Siebert was one. I don't — In your blue brief to this court, that is not the relief that you asked for, though. No. In my brief to this court, other than reversing granting the writ, I asked for the written written evidence to be sent back to the district court for an evidentiary hearing. Where is that in your blue brief? I'm looking at the conclusion where you have asked for request — you've asked for a grant of the writ of habeas corpus setting aside the conviction and remanding to the district court to require the Brady and Giglio materials to be handed over. Yes, you're correct, Your Honor. I don't ask for that Siebert relief in the blue brief. You're correct. You're — I mean, I guess I'm — the problem I have with the discussion you've just had with my colleagues is that your client's theory isn't that there was a Siebert violation, right? That's where the police get your client to confess without giving them a rand of warnings, give a, you know, a confession of stuff that the person is actually saying. Your client's theory is that he was fed all the details and then coerced into repeating them once the tape started rolling. That's not a Siebert or Siebert violation. That's just a — whether the confession is voluntary or not. And there was an evidentiary hearing in the state trial court on that very question. And the judge listened to Detective Hardy or whatever his name is? And found him more believable, because Hardy, of course, denied that any of that happened. So to me, that issue is over. And that's why I was positing the very first question to you. If we were to reject your attack on the validity of the confession, because I don't see any basis for you to get relief on that, then it seems to me when you shift to Brady, you're sort of stuck with that massive rock in the middle of the case. But I don't know how my analysis is inaccurate when I say if this had been a trial when it was only on the confession — and remember, there's no — there's no physical evidence ever tying Mr. Johnson to this event — then if you take out DeMarco Parker and you take out Monique Morris, that's a very different trial. You're not taking them out. You're impeaching their credibility. And the jury would still have to evaluate, with all this massive impeaching evidence against these people — they still testified, and your client testified, and Detective Hardy testified, and yes, there were some fairly successful attacks on some of his testimony in terms of credibility — but a jury would be asked to weigh all of these flawed witnesses and make a judgment. And the question on Brady, I think what Judge Watford is suggesting, is that how can we say that it probably would have or even likely would have changed the result? Because that's the test on appeal. I agree with you that this stuff should have been turned over, but now we're on appeal looking back at what happened in the trial court and also looking at it through the ADEPA telescope, and it creates a pretty heavy burden for you under both Brady materiality and ADEPA, doesn't it? Well, the one clear thing is that Monique Morris took the stand and said she had no idea what the terms of her plea agreement were. She lied. And she lied, and the state had an obligation to correct it, and it didn't, and that's automatic reversal. I don't even need to show prejudice in that scenario, and I've been saying that all along. And so one of the things here that's been, and I agree with you, yes and no, we don't just take them out. I think that the remedy at the state court would have been that you don't get to just send your snitches across the street from a federal proceeding and send them over without their file and without their jacket to testify in a state proceeding. What the state court judge should have done, instead of saying, well, we can't make the feds give it to us, is exclude the witnesses. So to that extent, I say remove them. Pretend that the state court judge had made the proper due process ruling at the trial, and let's assume that we don't have DeMarco Parker without his snitch jacket and his file, and that we don't have Monique Morris, and that this case simply went to trial on Mr. Johnson's statement with his explanation that those are the things he was told to say by Detective Hardy. I think that's a very different result, and I think I've met the burden on that. But beyond that, and I see that I'm very, very low on my ‑‑ I'm not sure if I'm still on. That's as much time as you have total. Okay. Then I better stop. Beyond that, I think the State had an absolute duty to correct the statements of Monique Morris that were utterly false or untrue, and they didn't do it, and that's an automatic reversal scenario. And that's what has always been required in this case. I'll reserve the rest of my time. You may do that. Thank you. We'll hear next from the State. Good morning, Your Honors. My name is Dennis Wilser from the Nevada Attorney General's Office, appearing on behalf of the Respondent, Theopapa Lee. Contrary to Pellitt's claims, this case doesn't hinge on the testimony of DeMarco Parker and Monique Morris. The case hinges on his confession and the amount of impeachment that was done of those two witnesses. He confessed to the crime. It was a detailed confession from his unique perspective. After he found out that maybe he shouldn't have done that, then he kind of changed his story and said, well, I heard the majority of the stuff that I confessed to from the streets, and the rest of it was given to me by Detective Hardy. Again, if you look at that testimony, that confession, especially towards the end, where he starts to express his concern that this shouldn't have happened. We went in there with the guns. They should have given us the dope and the money without anybody getting shot. He just repeats that about three times. So that's the key evidence here. Based on that confession and based on his testimony at trial about how he was told all this by Detective Hardy, again, that testimony is far from credible. So the Nevada Supreme Court decided that based on the fact that there was a confession and each order of affirmance in the judgment of conviction and the order affirming the denial of the motion for a new trial and in order regarding the petition for rehearing, the court says each time, based on his confession, based on that, it doesn't matter if this additional information had come in. He can't show that that would have changed the outcome at trial. What's your response to counsel's argument that the withholding of certain information results in an automatic reversal? And I don't know if that argument was made in her opening brief, Your Honor. I don't know if there was that type of statement. Well, what's your response to it on the merits? Well, my response is I don't know if it means automatic reversal. My response would be that CYBIRT really doesn't apply because It's not CYBIRT. The question is, if a government witness lied on the stand and the prosecutor knew she was lying, why isn't that automatic reversal under NAPU, I suppose? And the Nevada Supreme Court looked at that argument, and I don't the facts of her testimony show that she didn't know. That's what she said. I don't know if I'm supposed to plead in this case. During the evidentiary hearing that took place in the State Court, this was brought up again by the prosecution. The prosecution said, we don't know if it's in her plea agreement that she's going to get this type of treatment or that type of treatment. What do you mean, we don't know? It is in the plea agreement. Well, I believe they said the plea agreements were under seal at that point. Yeah, but you guys were involved in a joint task force with the federal government. One of your people was a special assistant United States attorney. There were joint interviews between Las Vegas detectives and FBI agents. You had an obligation to get all that stuff and turn it over, whether it was under seal or not. You and the feds were working together. That's the record in this case. Well, the record also shows at the evidentiary hearing where they were discussing Monique Morris's testimony, and she's — and they just found out about her about one week before the actual trial. They said, in discussing her plea agreement, Ms. Monroe said, I don't know if it includes testifying in this court case because we have no involvement with what was done in federal court. Ms. Monroe is the same woman who was the special assistant U.S. attorney at the same time she was a state prosecutor? And I'm not — from the record in this case, Judge, I'm not sure that she was at the same time as an S.E.U.S.A. She says, again, I have asked that the plea agreements be given to us, and I have not yet received them. So there is some question based on that as to whether there was a joint investigation or whether they were working together. They said that they had requested the plea agreements and requested the other information, but it hadn't been given to them. I'd just like to touch a little bit on this pre-interview interview that allegedly happened. Detective Hardy explained it. And this, as I explained in my brief, this came from a misunderstanding during the initial prelim. I'm not sure it's a misunderstanding. It doesn't seem he misunderstood to me. When I read these several interviews or proceedings that Hardy was involved in — and talking to people so he can make sure they know enough to then go on the record that they really have information. And the second time, I think he said, well, it wasn't an hour. Maybe it was half an hour. And then by the time he gets to trial, he had barely met the guy before. I mean, he kept changing his tune. And so it still may not be a Siebert problem because his claim isn't really that he truthfully confessed under pressure and then was Mirandized and confessed again. His claim is that the entire confession was false both times, which is off to one side, perhaps. But I found it somewhat troubling, I must say, that Hardy's change of story. And I think what happened at the prelim was that he was asked a question about how long this interview prior took. And Detective Hardy thought that that was talking about how long was the interview itself, one hour. So he misunderstood the word prior to mean not prior to the interview, but prior to the prelim. He clearly testified at trial that the pre-interview was just going over the types of things that they were going to ask him, that they wanted him to tell the truth, that if he found out that he didn't tell the truth, it wouldn't look good for him. And that was about 15 minutes long, approximately. And what about the other 45 minutes? Well, I don't think there was another 45. Well, I think that his colleague, Detective Sherwood, says there was another 45 minutes. He said we were with him for an hour. Now, he didn't testify at trial because the government chose not to testify him at trial, probably because they didn't like what he was going to say because of what he had said previously. But he said they were with him, they were with Mr. Johnson for an hour. The last 15 minutes was explaining sort of the housekeeping ground rules. And I believe the initial 45 minutes was just getting him transported, getting him over there, waiting for everything to get set up, doing that kind of thing. And Detective Hardy testified at a trial that there was no pre-interview interview where he told him what to say. If you look at what he did testify to, supposedly saying that Detective Hardy told him to do that in light of that detailed testimony about what happened before and during the shooting. Well, that's why I say there, in my mind, that neither one of them is very credible, but on different points. I find it difficult to credit that the confession was all made up, and I find it difficult to credit that there was no pre-interview. But I don't know where that leaves us under an AEDPA standard, that it's sort of irrelevant what I think, because I'm not the fact-finder and I'm not the first-line appellate court either. So what is our standard of review on the specific question about the pre-interview, which there seems to be no factual finding about on the part of the state court? I don't know, Your Honor. I'm sorry. Well, there is a factual finding because there was a suppression hearing and the state trial judge heard the evidence, heard Hardy testify. And if he had believed Mr. Johnson, he would have found the confession involuntary and excluded it. And instead, the court made the exact opposite ruling. So I think your response is that there's nothing for us to review. I mean, we're not going to be able to overturn a state trial judge's credibility determination under AEDPA. I assume that would be your response. And I would say that's correct, Your Honor. Let me ask you a related question. Forgetting credibility for a moment. There is this question about whether or not Johnson was told by Hardy when he gave him his Miranda warnings that he was arrested for, I guess it was an automobile case or something. And he wanted to talk to him about the murder, but he wasn't under arrest for the murder. And he signed a Miranda card or a Miranda form that was labeled rights of persons arrested. And he'd been arrested for the automobile theft, not for the murder. And in the transcribed lead up to the interview, Hardy says to him, we're going to ask you questions in reference to a double homicide that occurred on Jackson Street. You understand that's what we're going to talk to you about? Yes. And you also understand that you're under arrest for some other charges, something to do with a vehicle, whatever, stop for. He says, I don't know anything about the car, though. OK, but I'm as far as what you're under arrest for, you're not under arrest for anything to do with this case, this murder. OK. OK, I mean, as far as the double homicide, we haven't placed you under arrest. We're going to place you under arrest tonight. We're not going to place you under arrest tonight for anything involving this homicide. But we're here to get your side of the story as to what happened. Do you understand? Yes, I understand. OK, and prior to starting this interview, you had read a rights of persons arrested card and you understood those rights. Yes. OK, and you signed that card saying you understand those rights. And that's pertaining to this case right here. You being under arrest has to do with whatever those other officers brought you here for. Oh, OK, whatever that whole incident was, I don't even know where it is. Oh, OK, you understand that. Yeah. OK, but you're not under arrest for anything to do with the homicide. OK? OK. So now I'm going to ask you about the homicide. So what flows from that? He's clearly told he's not under arrest for the homicide. He's given Miranda warnings with respect to the vehicle. He signs a rights of persons under arrest card with respect to the vehicle. He understands his rights, but he's been told he's not under arrest for the murder. And he's not going to be arrested for the murder. Tonight. Tonight. Tomorrow morning. Tomorrow morning. He's arrested. And we don't know whether he sort of whispered the word tonight under his breath. So what flows from that Miranda issue as opposed to the Sybert one and whether they put words into his mouth and all that? Well, when they first found out about this, these shootings, Detective Hardy put out an attempt to locate on him. He just wanted to question him. So when he was arrested on the possession of stolen vehicle charge, they notified him of that. So he come over to question him about that. And my understanding from the record is that the rights that were read were regarding the two murders. I think he made that clear in his testimony at trial. Who? Detective Hardy. Yeah. But we don't think he's credible. If you go to the defendant's testimony at the very beginning, he says he was there to talk to me about the double murders. That's it. So there was his rights were read at that point. And that was his understanding. He understood that he was free to leave, that he wasn't under arrest for the murders. But he was still being held on that. Now, that testimony was heard by the jury, was heard by the court. And they ruled that the testimony was admissible. And the Madison Supreme Court ruled that the testimony was also admissible. I see, Your Honor, that I've got 22 seconds left. I'll just close by saying that based on his confession, based on his far from credible testimony at trial, based on the amount of impeachment, I believe it was referred to as massive by this court a few minutes ago. So based on that, there was no way that this information that was not disclosed would have resulted in a different outcome. And I ask the court to rule in the State's favor. Thank you, counsel. Ms. Rasmussen, you have a little bit of rebuttal time remaining. Thank you. Okay, in the record at 1168 is where Vicki Monroe appears for the first time as a SAUSA Special Assistant United States Attorney on March 9, 2003. This case goes to trial in August. She clearly is working as a prosecutor in the federal case. She tells the judge in this case five days before trial, which appears to be the day that they notice Monique Morris as a witness, that she has no involvement in that case and has no ability to get any of the information that trial counsel for Jamal Johnson is requesting. That's in the record at 266. That's a lie, actually. That's just a blatant lie to the state court. The due process violations in this case, to me, I started off telling you that they haunt me. They haunt me to this day. I have this same prosecutor from this case, Mark DiGiacomo, as we sit here writing oppositions to motions for discovery in Nevada right now saying that Brady is not a trial right. It's a post-trial remedy. I mean— Well, that's ludicrous. Of course. But he gets away with it because no one makes him give anything. So this keeps happening because nobody challenges him. Nobody says, you're right. That information should have been given. These outright blatant lies that happened in this case. Mr. Johnson is serving four life without parole sentences. He was 18 at the time these offenses were committed and 19 when he was arrested. DeMarco Parker was released last year. Kevin Fleming has been out since 2007. Myron Mangrum gets out next year. And Daryl Biddle— And they were all prosecuted in federal court. In federal court. And the timing of this. Look at the time. And it's all in the record. They waited until right after the closing arguments in Mr. Johnson's case to announce the arrest and the indictment of all of these Rolling 60 people and that they were going to seek the death penalty on all these people, none of which happened, although there was some—I mean, certainly DeMarco Parker would have been one of those people that was eligible for that category. And before—on the eve of deliberations, while they're deliberating, this hits the news, which is really the first time trial counsel would have known. And it wasn't until I discovered it that Vicki Monroe had been deputized as a Sousa and was very involved with the federal prosecution and probably intimately involved on the timing of this, and waiting to do the arrest and make the—and, you know, unseal the indictment and make it public on the eve of the closing of Jamal Johnson's trial before the jury came back. Counsel, you have exceeded your time. I'm sorry. But we appreciate very much your arguments. Thank you. And there's one case I should have done a Rule 28J letter on that case. You may— And I will submit it. Why don't you leave that citation with opposing counsel and with the clerk before you leave the courtroom, and we'll take account of your— Thank you so much. —your additional citation. And I apologize to Watford for butchering your name. I've had it butchered much worse than that, so— Well, mine has been butchered a lot, too, but it's a pleasure appearing before you. The case just argued is submitted, and we appreciate the arguments from both counsel.
judges: Friedman, Graber, Watford